IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RODNEY ALVERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:09-CV-81-TMH |
| | ) | (WO) |
| | ) | |
| JOHN CUMMINS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

In this 42 U.S.C. § 1983 action, Rodney Alverson ("Alverson"), a state inmate, challenges the constitutionality of actions taken against him during his incarceration at Kilby Correctional Facility ("Kilby") and Easterling Correctional Facility ("Easterling").  Alverson names as defendants John Cummins, Warden of Kilby; Louis Boyd, Warden of Easterling; Richard Allen, former Commissioner of the Alabama Department of Corrections ("ADOC"); Paul Whaley, former ADOC Classification Director; Kathy Holt, ADOC Classification Director; Angela Lawson, ADOC Classification Director; Sharon Blakely, ADOC Administrative Assistant;  Patricia Sapp Liptrot, Corrections Officer; and Daphne Kay Wilson and Delana Flowers, registered nurses.

The Amended Complaint is not a model of clarity.  As best as the court can discern, Alverson asserts the following claims:

(1)     Nurses Wilson and Flowers acted with deliberate indifference to his health by

refusing to provide medical treatment for his complaints of nicotine-withdrawal headaches.

(2)     Classification Directors Whaley, Holt, and Lawson retaliated against him for writing letters to ADOC officials by transferring him to Easterling Correctional Facility.

(3)     The defendants denied him access to the courts by removing a cardboard writing table from his cell and by changing the requirements for the size of ADOC-approved envelopes.

(4)     The prohibition of cigarettes and other tobacco products at Easterling is a violation of the Due Process Clause and the Equal Protection Clause.

(5)     The defendants subjected him to unconstitutional conditions of confinement at Easterling.

(6)     Defendant Sapp subjected him to cruel and unusual punishment by refusing to allow family members to visit him.

(7)     The defendants violated his constitutional rights by confiscating and subsequently destroying his tobacco products.

The defendants filed answers, special reports, and supporting evidentiary materials addressing Alverson's claims for relief. (Doc. Nos. 21-22, 35-36, 45-46.)  Pursuant to this court's order entered on June 26, 2009, the court deems it appropriate to treat the special reports as motions for summary judgment.  (Doc. No. 48.)  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of such motions, the

evidentiary materials filed in support thereof and Alverson's responses in opposition to the motions, the court concludes that the motions for summary judgment are due to be granted.

## II.  STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); FED.R.CIV.P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[1]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [- now dispute -] of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing the nonmoving party has failed to present evidence in support

---

[1]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions." Fed.R.Civ.P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word -- genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination." *Id*.  "'Shall' is also restored to express the direction to grant summary judgment." *Id*.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

The defendant has met his evidentiary burden and demonstrated the absence of any genuine dispute of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate evidence beyond the pleadings, that a genuine dispute material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact by [citing to materials in the record including affidavits, relevant documents or other materials] the court may ... grant summary judgment if the motion and supporting materials -- including the facts considered undisputed -- show that the movant is entitled to it.") A genuine dispute of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263. Consequently, to survive the defendants' properly supported motions for summary judgment, Alverson is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims for relief. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory

4

allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). Hence, when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v. Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (If on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the

substantive law applicable to the case.  *Anderson*, 477 U.S. at 248; *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").  "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).  To demonstrate a genuine dispute of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts....  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates there is no genuine dispute of material fact and establishes the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper.  *Celotex*, 477 U.S. at 323-324 (Summary judgment is appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine dispute as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (To establish a genuine dispute of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor).

Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a

6

*pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990). Thus, the plaintiff's *pro se* status alone does not mandate this court's disregard of elementary principles of production and proof in a civil case. In this case, Alverson fails to demonstrate a requisite genuine dispute of material fact in order to preclude summary judgment. *Matsushita*, *supra*.

## III. FACTS[2]

### A. Facts Related to Correctional Defendants

In December 2008, Alverson was imprisoned in Kilby Correctional Facility. (Doc. No. 9, p. 5.) Shortly thereafter, Alverson learned that, due to a change in his prison classification status, ADOC officials were planning on transferring him to West Jefferson Correctional Facility ("West Jefferson"). (*Id.*, p. 6.) Recalling the unpleasantness of his prior incarceration at West Jefferson, he wrote letters to Classification Directors Lawson and Holt, Commissioner Richard Allen, and Governor Bob Riley requesting a transfer to Limestone Correctional Facility. (*Id.*) Alverson's plans for a transfer to Limestone,

---

[2] At this stage of the proceedings, this court takes the facts alleged by Alverson as true and construes them in the light most favorable to him. *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000) (citations omitted) ("In assessing whether there is any 'genuine issue' for trial, the court 'must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party,'" ... and 'resolve all reasonable doubts about the facts in favor of the non-movant.' ... Moreover, the court must avoid weighing conflicting evidence or making credibility determinations...."). Thus, the facts set forth herein are drafted assuming all allegations presented by Alverson are true.

however, were snuffed out like a half-smoked cigarette in an ashtray.  On January 9, 2009, a corrections officer escorted Alverson to the receiving room, informed him that he was being transferred to Easterling, a non-smoking correctional facility, and advised that he should trade his tobacco products for other non-contraband items with the other smokers in the facility.  (*Id*.)  When Alverson asked the corrections officer for a property sheet to list his belongings, the officer refused to do so and ordered him to throw away his tobacco products. (*Id*.)

Later in the morning, Alverson was transferred to Easterling and assigned to Dorm D, Side 2.  (*Id*., p. 7, 10.)  Upon his arrival, a corrections officer confiscated Alverson's eyeglasses, rolling papers, and matches and told Alverson that he should arrange to send the property home within ninety days.  (*Id*., p. 7; Attach. to Doc. No. 9, Pl's Affid., p. 2.)  On January 15, 2009, Alverson submitted an inmate request slip, inquiring when his property would be returned to him.  (Attach. to Doc. No. 9, Pl's Ex. P.)  An officer responded that the property was "disposed of according to Regulations."  (*Id*.)  Alverson subsequently sent a letter to Commissioner Allen, Governor Riley, and Classification Director Holt, as well the State of Alabama Board of Adjustment, complaining about the destruction of his property. (Attach. to Doc. No. 9, Pl's Affid., p. 4; Doc. No. 39, p. 3; Attach. to Doc. No. 39, Pl's Ex. 9.)  The Board, however, denied the claim.[3]  (Doc. No. 117.)

_____

[3] The Board based its determination in part on the affidavit of Warden Louis Boyd, in which he stated:

> . . . Inmate Alverson was in possession of store items, which he did not have a valid store receipt for.  Inmate Alverson also possessed a pair of eyeglasses, which were tinted, and he did not have a valid medical profile to have

Shortly after arriving at Easterling, Alverson completed a visitor's list, in which he listed Angela Alverson as his wife, Debra Wilson as his mother-in-law, James Wilson as his brother-in-law, and Crystal England as his sister-in-law. (Doc. No. 9, Pl's Ex. A.)  Angela Alverson suffers from mental retardation and/or is mentally impaired.  (Doc. No. 114, p. 2.) James Wilson is Alverson's sister's common-law husband, and Debra Wilson is James Wilson's mother.  (Doc. No. 9, Pl's Ex. W, p. 4; Doc. No. 46, Ex. D.)  Officer Liptrot informed Alverson that neither Debra Wilson nor Crystal England were allowed to visit because they were "not immediate family" and removed their names from the list.  (Doc. No. 9, Pl's Ex. A.)  The ADOC regulations provide that visitors may include immediate family, such as a mother, father, stepparents, foster parents, husband, wife, children, step-children, grandchildren, brother, sister, grandmother, grandfather, half-siblings, son-in-law, daughter-in-law, mother-in-law, and father-in-law.  (Doc. No. 46, Defs' Ex. D, p. 1.)  The regulations also provide that married inmates may list one friend of the same sex and unmarried inmates may list one friend of each sex.  (*Id*.)  Inmates listing immediate family as visitors must provide legal documentation proving their relationship.  (*Id*.)

On February 17, 2009, Alverson submitted an Inmate Request Slip to the warden, in

---

the glasses.  These items were confiscated and documented on ADOC form 338-A, "ADOC Inmate Property Sheet - Institution," as Stored Property.  Inmate Alverson was advised that he had 30 days to dispose of the items.  He could send the items home by visitors, mail the items home at his expense, or donate the items to charity.  If the items were not removed in 30 days, they would be destroyed.  Inmate Alverson signed the form illustrating he understood these directions.

(Doc. No. 117-2.)

which he requested that either Crystal England or Debra Wilson be allowed to accompany his wife to visitation due to her mental impairment.  (Doc. No. 9, Pl's Ex. S.)  After the inmate request was forwarded to Officer Liptrot, she requested that Alverson provide a copy of his wife's birth certificate.  (*Id*.)  Shortly thereafter, Officer Liptrot denied the request.  (*Id*.)  Upon receiving a notice of the denial, Alverson attempted to remove his wife from his visitation list and add Debra Wilson as a visitor. (Doc. No. 114, p. 2.) Correctional officials, however, refused to allow Debra Wilson to visit him in light of his marital status.  (*Id*.)  Consequently, Alverson began divorce proceedings against his wife.  On October 20, 2011, the plaintiff and Angela Alverson were divorced in the Montgomery County Circuit Court.  (Doc. No. 120.)

During his initial imprisonment at Easterling, Alverson also encountered problems with receiving mail from Debra Wilson.   On January 27, 2009, Alverson received a "Notification of Rejected Mail," in which a corrections official noted that correspondence from Debra Wilson was rejected because the envelope was not the standard size.  (Attach. to Doc. No. 9, Pl's Ex. E.)  Alverson submitted a written appeal, in which he asserted that he "[was not] able to get in touch with Debra to tell her about the legal size, she should be sending me stamps and legal exhibits, I'll take this up in court."  (*Id*.)  Corrections officials denied the appeal.  (*Id*.)  Alverson's troubles, however, did not stop there.

In early February 2009, Easterling was locked down due to an incident in the F dorm.  (Doc. No. 9, p. 8; Attach. to Doc. No. 9, Pl's Ex. W, p. 6.)  Around this time, the riot squad officers ordered inmates to remain on their beds and would not allow them to use the

restroom.  (Attach to Doc. No. 9, pp. 6-7.)  The following day, riot squad officers entered the D-dorm and ordered all inmates to roll over, cross their legs, and place their hands behind their heads.  (Attach. to Doc. No. 9, p. 6.)  Alverson forgot to cross his legs.  (*Id*.)  A riot squad officer slapped Alverson across the back of his head, causing Alverson's nose to bleed. (*Id*.)

## B.  Facts Related to Medical Defendants

Shortly after his transfer to Easterling, Alverson began suffering from nicotine-withdrawal headaches.  On January 22, 2009, Alverson submitted a Correctional Medical Services ("CMS") health services request form, in which he complained, "I am having mental headaches wanting to smoke cigarettes, I don't want to quit! and will not try too!  The more I think about other inmates being allowed to smoke at other facilities makes my head[aches] worse.  I need to get these headaches to stop!"  (Doc. No. 22, Attach. to Beth Long's Affid., p. 33.)  A nurse advised Alverson that  CMS does not have any control over the ADOC non-smoking policy.  (Doc. No. 36, Def's Ex. 1, Nurse Flowers' Affid., p. 3.) Both Nurse Flowers and Alverson signed a CMS Release of Responsibility form.  (Doc. No. 22, Attach to Beth Long's Affid., p. 19.)  When Alverson requested a CMS grievance form, Nurse Flowers refused to give him one.  (Doc. No. 44, p. 1.)

On February 4, 2009, Alverson submitted a CMS health request form requesting medical treatment for his ankle.  (Doc. No. 9, p. 8.)  Medical personnel subsequently scheduled an appointment for Alverson to see a physician on February 11, 2009.  (Id.)

11

Unbeknownst to Alverson, CMS placed a $3.00 hold on his inmate account before the scheduled appointment.  (*Id*.)  Before his appointment, Alverson attempted to purchase necessities from the prison store with the last of money he had received as a gift from Debra Wilson.  (*Id*.)  The prison store clerk refused to allow Alverson to purchase the items due to the hold on his account.  (*Id*.)

## IV.  DISCUSSION

### A.  Requests for Injunctive and Declaratory Relief

The pleadings demonstrate that Alverson is no longer incarcerated in Easterling.  This court therefore concludes that, to the extent Alverson seeks injunctive and declaratory relief with respect to the conditions at Easterling, his requests for injunctive and declaratory relief are due to be dismissed as moot.  *See Los Angeles County v. Davis*, 440 U.S. 625 (1979); *Cotterall v. Paul*, 755 F.2d 777 (11th Cir. 1985).

### B.  Absolute Immunity

With respect to any claims Alverson lodges against the defendants in their official capacities, they are entitled to absolute immunity from monetary damages.  Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985).  "A state official may not be sued in his [or her] official capacity unless the state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900,  908, 79

12

L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities."  *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear that the defendants are state actors entitled to sovereign immunity under the Eleventh Amendment for claims seeking monetary damages from them in their official capacities.  *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994).  Thus, each of the defendants is entitled to absolute immunity from those claims for monetary relief presented against them in their official capacities.  *Parker v. Williams*, 862 F.2d 1471 (11th Cir. 1989).

## C.  Respondeat Superior

Neither Alverson's Amended Complaint nor any evidentiary materials show that Governor Riley or Commissioner Allen had anything to do with any harm alleged by Alverson.  Thus, Governor Riley is sued solely due to his position as the Governor of the State of Alabama and Commissioner Allen is sued solely due to his position as Commissioner of the Alabama Department of Corrections. In addition, Wardens Cummins and Boyd are sued solely due to their positions as wardens of Kilby and Easterling

Correctional Facilities.  However, the law is well settled that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability).  Thus, Governor Riley, Commissioner Allen and Wardens Cummins and Boyd are liable in the present cause of action only if they "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions ... and the alleged constitutional deprivation." *Cotton v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation omitted).

Alverson does not allege that Governor Riley, Commissioner Allen,  or Wardens Cummins and Boyd personally participated in the actions about which he complains. Additionally, Alverson fails to present any facts which indicate a causal relationship between an action undertaken or policy enacted by Governor Riley, Commissioner Allen, or Wardens Cummins and Boyd and the alleged constitutional deprivations.  A supervisory official "may be liable only for implementing a policy that is 'itself [ ] a repudiation of constitutional rights' and 'the moving force of the constitutional violation.' *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985)." *Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2006). Consequently, the claims against Governor Riley, Commissioner Allen, and Wardens Cummins and Boyd lack an arguable basis in law and therefore warrant dismissal.

### D. Claims Presented on Behalf of Other Inmates

Standing is a cornerstone of American jurisprudence on which jurisdiction lies. "[A] litigant may only assert his own constitutional rights or immunities." *McGowan v. Maryland,* 366 U.S. 420, 429 (1961), citing *United States v. Raines,* 362 U.S. 17, 22 (1960); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 218-219 (1974) (plaintiff must assert a legally cognizable injury in fact before federal courts have jurisdiction). "The essence of a standing question is whether the plaintiff has alleged 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions[.]' *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703 7 L.Ed.2d 663 (1962)." *Saladin v. City of Milledgeville,* 812 F.2d 687, 690 (11th Cir.1987); *Harris v. McRae,* 448 U.S. 297, 320 (1981) (same).

Standing involves two aspects. The first is the minimum "case or controversy" constitutional requirement of Article III. *Saladin,* 812 F.2d at 690. "To satisfy this 'irreducible' constitutional minimum required for standing, a litigant must show 1) that he personally has suffered an actual or prospective injury as a result of the putatively illegal conduct; 2) that the injury can be fairly traced to the challenged conduct; and 3) that the injury is likely to be redressed through court action." *Saladin,* 812 F.2d at 690, citing *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472 (1982); *Warth v. Seldin,* 422 U.S. 490, 499 (1975). If any element is lacking, a plaintiff's claim is not viable. In addition, the Supreme Court has established several

15

requirements based on prudential considerations. *Saladin,* 812 F.2d at 690 (internal citations omitted) ("The Supreme Court has also stated that, in addition to these essential constitutional requirements, a court should consider the case in light of three principles which might counsel judicial constraint, referred to as 'prudential' considerations.... Those considerations are 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue; 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.").

In the instant complaint, Alverson seeks to assert several claims relative to conditions of confinement and excessive force to which other inmates have been subjected at correctional facilities throughout the Alabama prison system.[4]  Alverson lacks standing to assert the constitutional rights of other persons. *Saladin, supra.; Allen v. Wright,* 468 U.S. 737, 751 (1984).  The prudential limitation applicable in this case is that a litigant may not assert the legal rights or interests of another person.  With respect to the claims arising from alleged violations of other inmates' constitutional rights, Alverson is not "asserting his ... own legal rights and interests [but] rather ... the legal rights and interests of third parties." *Saladin,* 812 F.2d at 690. These claims, therefore, entitle Alverson to no relief.

---

[4] In the Amended Complaint, Alverson also asserts that a riot squad officer used excessive force against him during a lockdown.  Alverson, however, does not name this officer in the Complaint, Amended Complaint, or amendments thereto.  Therefore, this excessive force claim is not properly before the court and is due to be dismissed.

### E. Medical Treatment for Caffeine-Withdrawal Headaches

Alverson complains that Nurses Flowers and Wilson failed to provide him adequate medical treatment for his symptoms of caffeine withdrawal. (Doc. Nos. 9 & 27.) The defendants deny they acted with deliberate indifference to Alverson's health.

To prevail on a constitutional claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that those responsible for providing the treatment acted with deliberate indifference to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000); *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986). Specifically, medical personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989). When seeking relief based on deliberate indifference of responsible officials, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts." *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner). Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." *Farmer v.*

17

*Brennan*, 511 U.S. 825, 837 (1994); *Johnson v. Quinones*, 145 F.3d 164, 168 (4th Cir. 1998)

(defendant must have actual knowledge of a serious condition, not just knowledge of

symptoms, and ignore known risk to serious condition to warrant finding of deliberate

indifference). Furthermore, "an official's failure to alleviate a significant risk that he should

have perceived but did not, while no cause for commendation, cannot under our cases be

condemned as the infliction of punishment." *Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate
> indifference, ... the Supreme Court has ... emphasized that not 'every claim by
> a prisoner that he has not received adequate medical treatment states a
> violation of the Eighth Amendment.' *Estelle*, 429 U.S. at 105, 97 S.Ct. at 291;
> *Mandel*, 888 F.2d at 787. Medical treatment violates the eighth amendment
> only when it is 'so grossly incompetent, inadequate, or excessive as to shock
> the conscience or to be intolerable to fundamental fairness.' *Rogers*, 792 F.2d
> at 1058 (citation omitted). Mere incidents of negligence or malpractice do not
> rise to the level of constitutional violations. *See Estelle*, 429 U.S. at 106, 97
> S.Ct. at 292 ('Medical malpractice does not become a constitutional violation
> merely because the victim is a prisoner.'); *Mandel*, 888 F.2d at 787-88 (mere
> negligence or medical malpractice 'not sufficient' to constitute deliberate
> indifference); *Waldrop*, 871 F.2d at 1033 (mere medical malpractice does not
> constitute deliberate indifference). Nor does a simple difference in medical
> opinion between the prison's medical staff and the inmate as to the latter's
> diagnosis or course of treatment support a claim of cruel and unusual
> punishment. *See Waldrop*, 871 F.2d at 1033 (citing *Bowring v. Godwin*, 551
> F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991). Moreover, "whether government

actors should have employed additional diagnostic techniques or forms of treatment 'is a

classic example of a matter for medical judgment' and therefore not an appropriate basis for

liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir.

1995); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact that prison

inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer,* 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991).... Even assuming the existence of a serious risk of harm and causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists--and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2001). Thus, for Alverson to survive summary judgment on his deliberate indifference claim against the defendants, he is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation." *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

The medical records demonstrate that Alverson signed a waiver in which he acknowledged his understanding that his request for treatment for nicotine-withdrawal symptoms was a "DOC issue" and also released "CMS [and] its employees and agents from all responsibility and ill effect which may arise from this action." (Doc. No. 22, Attach. to

Long's Affid.)  In addition, the medical records indicate that Alverson received Motrin or Tylenol on a routine basis during his imprisonment at Easterling.  (*Id*.)  To the extent Alverson asserts that he should have been provided a different treatment regimen, such as a nicotine patch or gum, for his symptoms of nicotine withdrawal, this assertion fails to establish deliberate indifference.  *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545 (whether medical personnel "should have employed additional ... forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment.");  *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violative of the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).  Alverson's mere desire for a different mode of medical treatment does not amount to deliberate indifference.  More importantly, Alverson has failed to present any evidence which indicates the defendants were aware of a substantial risk to his health and that with this knowledge consciously disregarded such risk.  The record is devoid of evidence, significantly probative or otherwise, showing that the medical defendants acted with deliberate indifference to Alverson's complaints of nicotine-withdrawal headaches.  Consequently, summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350.

20

### F.  Access to Courts

Alverson complains that defendants  denied him access to the courts by removing his writing table and changing the requirements for the size of approved envelopes.  The law directs that incarcerated persons are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  *Bounds v. Smith*, 430 U.S. 817, 825 (1977).  In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court clarified and limited the right to assistance recognized in *Bounds*.  Specifically, the Court held that "an inmate alleging a violation of *Bounds* must show actual injury" arising from the alleged inadequacies in the law library, legal assistance program or access provided by officials. *Lewis*, 518 U.S. at 349.  In identifying the particular right protected by *Bounds*, the Court explained that "*Bounds* established no ... right [to a law library or to legal assistance].  The right that *Bounds* acknowledged was the (already well-established) right of ***access to the courts***....  [P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"  *Id*. at 350-351 (emphasis in original) (citations omitted).  The Court further opined *Bounds* did not require "that the State ... enable the prisoner to ***discover grievances***, and to ***litigate effectively*** once in court....  To demand the conferral of such sophisticated legal capabilities upon a mostly uneducated and indeed largely illiterate prison population is [not something] ... the Constitution requires."  *Id*. at 354 (emphasis in original).

The Court similarly rejected the argument that the mere claim of a systemic defect, without a showing of actual injury, presented a claim sufficient to confer standing. *Id*. at 349.  Moreover, *Lewis* emphasized that a *Bounds* violation is related to the lack of an inmate's capability to present claims.  518 U.S. at 356.  "*Bounds*, which as we have said guarantees no particular methodology but rather the conferral of a capability -- the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts.  When any inmate ... shows that an actionable claim of this nature which he desired to bring has been lost or rejected, or that the presentation of such a claim is currently being prevented, because this capability of filing suit has not been provided, he demonstrates" the requisite actual injury. *Lewis*, 518 U.S. at 356.  Finally, the Court discerned that the injury requirement is satisfied only when an inmate has been denied "a reasonably adequate opportunity to file nonfrivolous legal claims challenging [his] convictions or conditions of confinement....  [I]t is that capability, rather than the capability of turning pages in a law library, that is the touchstone." *Id*. at 356-357.  "[T]he Constitution does not require that prisoners ... be able to conduct generalized research, but only that they be able to present their grievances to the courts - a more limited capability that can be produced by a much more limited degree of legal assistance." *Id*. at 360.  The Court admonished that federal courts should allow prison officials to determine the best method of ensuring that inmates are provided a reasonably adequate opportunity to present their nonfrivolous claims of constitutional violations to the courts. *Id*. at 356.   A federal district court must

"'scrupulously respect[] the limits on [its] role,' by 'not ... thrust[ing] itself into prison administration' and instead permitting '[p]rison administrators [to] exercis[e] wide discretion within the bounds of constitutional requirements.' [*Bounds*, 430] U.S. at 832-833, 97 S.Ct. at 1500." *Id*. at 363.

The evidentiary materials establish that the ADOC promptly provided Alverson a notification of rejected mail, informing him that he had received correspondence from Debra Wilson which was "returned to sender" because the envelope was not the standard size. (Doc. No. 9, Pl's Ex. E.) On appeal of the notification, Alverson acknowledged that he had "not been able to get in touch with Debra to tell her about the legal size, she should be sending me stamps and legal exhibits. . . ." (*Id*.) He further advised that the defendants' rejection of the mail "prevent[ed] him from adequately filing a claim with the State Board of Adjustments!" (*Id*.)

The record in this case establishes corrections personnel provided Alverson access to legal materials during his confinement at Easterling and in no way inhibited his preparation, filing or processing of any legal causes of action. In addition, throughout the proceedings in this case, Alverson presented all requisite arguments and pleadings to this court, as well as the State Board of Adjustment, utilizing the mail system in a correctional facility. Moreover, the record indicates Alverson received all mail from this court without incident. Nothing in the record demonstrates the actions about which Alverson complains improperly impeded or adversely affected his efforts to pursue non-frivolous legal claims. Alverson has

23

utterly and completely failed to come forward with any evidence that the actions about which he complains deprived him of the ***capability*** of pursing claims in this or any other court. Consequently, Alverson does not establish he suffered the requisite injury, *Lewis*, 518 U.S. at 356, and the defendants are therefore entitled to summary judgment on his access to courts claim. *Barbour v. Haley*, 471 F.3d 1222, 1225 (11th Cir. 2006) (access to courts claim fails because plaintiff did not show any actual injury); *Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991) (inmate entitled to no relief on access to courts claim in "the absence of any indications of ultimate prejudice or disadvantage. . . .").


### G.  Free Speech

Alverson's argument that the defendants violated his constitutional rights by preventing him from receiving mail implicates the First Amendment right to free speech. Federal law recognizes "that 'courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.' [*Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807 (1974)].  As the *Martinez* Court acknowledged, 'the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.' *Id.*, at 404-405, 94 S.Ct., at 1807. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources...." *Turner v. Safley*, 482 U.S. 78, 84-85, 107 S.Ct. 2254, 2259 (1987).  Jail officials are therefore "accorded latitude in the administration of prison affairs[,]" *Cruz v.*

*Beto*, 405 U.S. 319, 321, 92 S.Ct. 1079, 1081 (1972), which necessarily includes "the [inescapable] withdrawal or limitation of many [inmate] privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974) (quotation marks and citation omitted); *Bell v. Wolfish,* 441 U.S. 520, 546, 99 S.Ct. 1861, 1877 (1979).   "In the First Amendment context, ... some rights are simply inconsistent with the status of a prisoner or 'with the legitimate penological objectives of the corrections system.'" *Shaw v. Murphy*, 532 U.S. 223, 229, 121 S.Ct. 1475, 1479 (2001), *quoting Pell*, 417 U.S. at 822, 94 S.Ct. at 2804. In accordance with this principle, an inmate's rights established under the First Amendment are not protected if allowing such protection is "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell*, 417 U.S. at 822, 924 S.Ct. at 2804; *Adams v. James*, 784 F.2d 1077, 1081 (11th Cir. 1986) ("In prison, of course, first amendment rights are not absolute. *Pell v. Procunier*, 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974).  Legitimate policies and goals of the correction system may justify restrictions limiting prisoners' [First Amendment] rights.  417 U.S. at 821.").

Generally, inmates possess a First Amendment right to send and receive mail.  *Al-Amin v. Smith*, 511 F.3d 1317, 1333 (11th Cir. 2008).  This right is, of course, subject to the limitations attendant to his status as a prisoner and the legitimate penological interests of jail administrators.  *Id*.

It is undisputed that jail personnel did not in any way interfere with any incoming mail sent from the court, court clerk, or attorney.  The record establishes that all incoming mail

25

in properly sized envelopes was promptly delivered to Alverson and all properly addressed outgoing mail prepared by the plaintiff was placed in the mail.  Thus, to the extent Alverson contends the defendants interfered with his right to send or receive mail in violation of his First Amendment right to freedom of speech, he is entitled to no relief and summary judgment is due be granted in favor of the defendants.

## H.  The Tobacco Claim

Alverson asserts that his confinement at Easterling, a non-smoking facility, violated his right to equal protection and substantive due process.  Under the equal protection clause, a prison policy must bear a rational relationship to a legitimate penological objective. *William v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988).  Courts which have addressed claims that prison anti-smoking policies violate the Equal Protection Clause have repeatedly rejected such claims.   *See e.g., Webber v. Crabtree,* 158 F.3d 460 (9th Cir. 1998); *Beauchamp v. Sullivan,* 21 F.3d 789 (7th Cir. 1994).  The reason for rejecting the notion of an equal protection violation in the face of prison no-smoking policies is based on a determination that the act of smoking is entitled to only a minimal level of protection under the Equal Protection Clause.  This is because smoking is obviously not a fundamental right nor is the classification between smokers and non-smokers a suspect one. *See, e.g., McGinnis v. Royster,* 410 U.S. 263 (1973); *Plyler v. Doe*, 487 U.S. 202, 216 (1981).   Because neither smoking nor possession of tobacco in a prison implicates any fundamental right, and does not involve any

26

suspect classification, only a "rational basis" standard of scrutiny applies. *McGinnis, supra.* *See also Washington v. Harper,* 494 U.S. 210 (1990). The question is simply whether the regulation serves a legitimate state interest and whether the challenged regulation is rationally related to it. *City of Cleburne, Tx.*, 473 U.S. at 440. *See also McGinnis,* 410 U.S. at 270.

Plaintiff has not shown that he has, in fact suffered, unequal treatment.  As a result of the potential § 1983 liability facing state actors if they do not protect non-smokers from smokers' second-hand smoke, the State of Alabama has a rationally based, legitimate interest in protecting the health of inmates who don't smoke.  *See Smith v. Boyd*, No. 2:09cv472-ID, 2011 WL 2118759, *7 (M.D. Ala. May 3, 2011) (slip opinion).  *See also Helling v. McKinney*, 509 U.S. 25 (1993).  In light of the Court's decision in *Helling*, the State of Alabama has a legitimate interest in eliminating non-smokers' exposure to second-hand smoke in its prisons.  A rational way of accomplishing the State's goal in this regard is to prohibit the sale or possession of tobacco products in its prisons.  The prison policy prohibiting tobacco use, sale, and/ or consumption at Easterling is reasonably related to the legitimate objective of preventing the use of tobacco in violation of the ban.  Thus, Plaintiff fails to state a viable equal protection claim and Defendants are due to be granted summary judgment on this claim.  *See Webber,* 158 F.3d 460; *Johnson v. Saffle,* 166 F.3d 1221, 1998 WL 792071 (10th Cir. 1998) (table); *Harvey v. Foote,* 92 F.3d 1192, 1996 WL 441776 (9th Cir. 1996) (affirming dismissal for legal frivolity) (table).

## I. Retaliation

Alverson asserts that he was transferred to Easterling, a non-smoking facility, in retaliation for writing letters to Governor Riley, Commissioner Allen and Classification Directors Lawson and Holt. The defendants, however, contend that Alverson was transferred to Easterling  because his classification level changed and one of his enemies is housed at Limestone.

To proceed on a claim for retaliation and withstand the entry of summary judgment, an "inmate must establish ... three elements: (1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the [defendant's] allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech.  *See Bennett v. Hendrix*, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005)." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008); *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999).  With respect to the causal relationship element, a prisoner must demonstrate that correctional officials intended to retaliate for his exercise of a right protected under the First Amendment and, but for the retaliatory motive, the adverse act complained of would not have occurred. *Woods*, 60 F.3d at 1166; *Smith*, 532 F.3d at 1278.

Alverson's claim that the defendants retaliated against him for writing letters to ADOC officials establishes that he was engaged in a protected activity.  *See O'Bryant v. Finch*, 637 F.3d 1207 (11th Cir. 2011) (citing *Smith v. Mosley*, 532 F.3d 1270 (11th Cir.

2008); *Al-Amin*, *supra*.  The defendants, however, assert that Alverson was transferred to Easterling because he has a known enemy at Limestone.  Therefore, the defendants articulated a legitimate, non-retaliatory reason for transferring Alverson to Easterling. Although Alverson argues that he and the other inmate are friends, ADOC records indicate that Manuel Darwin Nickens is incarcerated at Limestone and is listed as an enemy on his enemy list.  Alverson has presented only his mere conclusory allegation that the defendants' actions were retaliatory. Consequently, Alverson has failed to establish that the defendants retaliated against him and, therefore, summary judgment should be granted on this claim.

To the extent Alverson argues that the defendants should have transferred him to a correctional facility closer to his family, he is likewise entitled to no relief.  A convicted prisoner has no constitutionally protected right to confinement in a particular penal facility. *Meachum v. Fano*, 427 U.S. 215, 224 (1976).  Thus, an inmate may be confined in any correctional facility without implicating the prisoner's constitutional rights.  *Id.*; *see also Montanye v. Haymes*, 427 U.S. 236, 242 (1976).  Although the plaintiff's confinement at Easterling may have entailed "more burdensome conditions" than that of another facility such confinement is "'within the normal limits or range of custody which the conviction has authorized the State to impose.' [*Meachum,* 427 U.S. at 225]; *see also Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976)." *Sandin v. Conner*, 515 U.S. 472, 478 (1995).  Consequently, the failure to transfer Boyd to a more favorable correctional facility does not rise to the level of a constitutional violation and such claim

therefore provides no basis for relief in this 42 U.S.C. § 1983 action.

## J. Conditions of Confinement

Alverson complains that the defendants subjected him to unconstitutional conditions of confinement during his incarceration in Easterling.  Specifically, he alleges: (1) the prison is overcrowded; (2) there are only two televisions in the D-dorm; (3) the showers are in use no more than two hours a day and only seven shower heads are functional; (4) inmates are allowed no more than ten minutes to take a shower; (5) there are five toilets which are two feet apart from each other in his dorm area; (6) the toilets are not private;  (7) the prison lights are not turned off until 10:30 p.m. each night; (7) there are frequent announcements over the intercom throughout the evening; (8) the lights are turned on for diabetic chow hall at 3:00 a.m.; (9) there are only two tables on Side 2 of the D-dorm; (10) the chow hall is overcrowded; (11) the hobby craft shop is closed most of the time; (12) the facility smells like a landfill; and (13) there is an insufficient amount of toilet paper allotted to each inmate. (Doc. No. 9.)

Only those conditions which deny inmates "the minimal civilized measure of life's necessities" are grave enough to violate the Eighth Amendment.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (19891).[5]  "'[T]he Constitution does not mandate comfortable prisons.' *Id.* at

---

[5]The Eighth Amendment applies to the states through the Fourteenth Amendment. *Rhodes,* 452 U.S. at 344-345.

349, 101 S.Ct. at 2400.  If prison conditions are merely 'restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.' *Id.* at 347, 101 S.Ct. at 2399.  Generally speaking, prison conditions rise to the level of an Eighth Amendment violation only when they 'involve the wanton and unnecessary infliction of pain.' *Id.*" *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).  A prison official may likewise be held liable under the Eighth Amendment for acting with "'deliberate indifference'" to an inmate's health or safety when the official knows that the inmate faces "a substantial risk of serious harm" and disregards that risk by failing to take reasonable measures to abate it.  *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 1974 (1994).  A constitutional violation occurs only when a plaintiff establishes the existence of "a substantial risk of serious harm, of which the official is subjectively aware, ... and [that] the official does not respond[] reasonably to the risk'...."  *Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001)(en banc), *quoting Farmer*, 511 U.S. at 844, 114 S.Ct. at 1982-1983.  Thus, in order to survive summary judgment on his claims challenging the conditions of confinement at Easterling, Alverson is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation."  *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995); *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003) ("To be deliberately indifferent, Defendants must have been 'subjectively aware of the substantial risk of serious harm in order to have had a "'sufficiently culpable state of mind.'""  *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at

1977-80; *Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991)....  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists-and the prison official must also 'draw that inference.' *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979.").

The living conditions within a county jail will constitute cruel and unusual punishment when the conditions involve or result in "wanton and unnecessary infliction of pain, [or] ... [are] grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes*, 452 U.S. at 347.  "Conditions ... alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities.  Such conditions could be cruel and unusual under the contemporary standard of decency ....  But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional." *Id*. at 347. To determine whether conditions of confinement constitute cruel and unusual punishment, the court must look to the effect the condition has upon the inmate. *Id*. at 366.  In a case involving conditions of confinement generally or several different conditions, the court should consider whether the claims together amount to conditions which fall below constitutional standards. *Hamm v. De Kalb County*, 774 F.2d 1567 (11th Cir. 1985), *cert. denied Hamm v. De Kalb County*, 475 U.S. 1096, 106 S.Ct. 1492, 89 L. Ed. 2d 894 (1986); *see also Chandler v. Baird*, 926 F.2d 1057 (11th Cir. 1991).

Despite his contentions regarding the conditions of confinement at Easterling,

32

Alverson does not establish that these conditions denied him the minimal civilized measure of life's necessities or subjected him to a wanton and unnecessary infliction of pain. *Wilson*, 501 U.S. at 298-299; *Rhodes*, 452 U.S. at 347.  Furthermore, Alverson fails to demonstrate any deliberate indifference or reckless disregard by the named defendants with respect to his health or safety.  Specifically, Alverson fails to identify any particular incident or condition of which the defendants were aware from which an inference could be drawn that a substantial risk of serious harm existed.  The record is also devoid of any evidence showing that the defendants drew the requisite inference.  Consequently, summary judgment is due to be granted in favor of the defendants on the claims challenging the conditions of confinement in Easterling.  *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999); *see also Carter*, 352 F.3d at 1349-1350.

## V.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The Motions for Summary Judgment be GRANTED.  (Doc. Nos. 22, 36, & 46.)

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before **July 5, 2012,** the parties may file objections to the

Recommendation.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 20th day of June, 2012.

/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE

34